587 So.2d 1072 (1991)
John Forrest PARKER
v.
STATE.
CR 89-838.
Court of Criminal Appeals of Alabama.
September 20, 1991.
*1076 H. Thomas Heflin, Jr., Tuscumbia, and Gene M. Hamby, Sheffield, for appellant.
James H. Evans, Atty. Gen., and J. Thomas Leverette and Sandra J. Stewart, Asst. Attys. Gen., for appellee.
BOWEN, Judge.
John Forrest Parker, the appellant, was indicted for capital murder for pecuniary gain in violation of Ala.Code 1975,  13A-5-40(a)(7). The jury found him "guilty of the offense of capital murder" and, by a vote of ten to two, recommended that he be sentenced to life imprisonment without parole. The trial judge overrode the jury's recommendation and sentenced Parker to death by electrocution. This appeal is from that conviction and sentence.

I.
The appellant argues that the prosecutor used his peremptory strikes in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and Ex parte Branch, 526 So.2d 609 (Ala.1987).
During the voir dire of the venire, the prosecutor challenged a venire member for cause and the following occurred:
"MR. HEFLIN [defense counsel]: For the record I would object that under Witherspoon [v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)], and also under my client's right to the 6th, 8th and 14th Amendments and also underÔÇöthat historically that on race that so many black people have been executed that excluding blacks that had that feeling [against the death penalty] would be depriving my client of the right to a jury of his peers.
"MR. ALVERSON [district attorney]: Judge, if he's trying to raise a Batson issue there, I don't think it applies in this case.
"THE COURT: Let the record show that the defendant is white and the victim is *1077 white or the alleged victim is white in this case. I'm going to overrule the objection and the challenge for cause is granted and Mr. Hogan is stricken."
R. 732-33.
On another occasion when the prosecutor challenged a venire member for cause, defense counsel made the following objection:
"To the 6th, 8th and 14th Amendments of the United States Constitution we would object to him and the historical nature of race and the imposition of the death penalty that excluding someone of the black race based on their beliefs on the death penalty prohibits my client from getting a fair trial from an impartial jury."
R. 760.
The jury was struck after extensive voir dire, and defense counsel made no Batson objection. At no time during the trial did defense counsel make any objection to the prosecutor's use of his peremptory strikes. Neither the prosecutor's use of his challenges for cause nor his peremptory strikes were made a ground of the motion for new trial.
On appeal, the appellant argues that the prosecutor used peremptory strikes to remove eight of the nine black members of the venire. This argument is not supported by the record on appeal.
In Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the United States Supreme Court rejected the claim that "death qualified" juries under Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), violate a defendant's right to have guilt or innocence determined by an impartial jury selected from a fair cross-section of the community. The exclusion of a cognizable group by the exercise of peremptory challenges is not a violation of the Sixth Amendment. Holland v. Illinois, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990).
However, under both federal and state constitutional law, a white defendant has standing to challenge the prosecutor's allegedly racially motivated use of peremptory challenges. Powers v. Ohio, ___ U.S. ___, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); Ex parte Bankhead, 585 So.2d 112 (Ala.1991); Ex parte Bird and Warner, [Ms. 89-1061 and 89-1062, June 14, 1991], 1991 WL 114762 (Ala.1991).[*]
In Bankhead, supra, the prosecutor used eight of his ten peremptory strikes to remove blacks from the venire. Even though two blacks served on the jury and despite the fact that no Batson objection was raised at trial, the Alabama Supreme Court noticed the matter under the "plain error doctrine" and remanded that case with directions that "[i]f the prosecution cannot provide racially neutral reasons for the use of peremptory challenges against black venire members, then Bankhead must receive a new trial." Bankhead, 585 So.2d at 117.
Under Bankhead, this Court has no alternative but to remand this case for an evidentiary hearing. See Ex parte Owen, 586 So.2d 963 (Ala.1991); Pierce v. State, 586 So.2d 1005 (Ala.Cr.App.1991); Walker v. State, 586 So.2d 49 (Ala.Cr.App.1991). Therefore, this cause is remanded to the trial court with directions that an evidentiary hearing be held at which the prosecution shall be required to give racially neutral reasons for the use of peremptory challenges against black venire members. If the prosecution cannot provide a racially neutral reason for every black venire member it struck, the trial judge must grant the appellant a new trial. In determining whether the reasons given by the prosecution are racially neutral, we direct the trial court's attention to Ex parte Bird and Warner, 1991 WL 114762. A transcript of the hearing and written findings by the trial judge shall be filed in this Court no later than 90 days after the date of this opinion.
The appellant also argues that the prosecutor used 22 of his peremptory strikes to improperly remove women from the venire. There was no objection made in the circuit court at any time to the alleged gender bias of the prosecution. While I adhere to my position that gender discrimination is prohibited under state law, that argument has been explicitly rejected by the other members *1078 of this Court, see Daniels v. State, 581 So.2d 536, 539 (Ala.Cr.App.1990), cert. denied, 581 So.2d 541 (Ala.1991), and Dysart v. State, 581 So.2d 541, 542-43 (Ala. Cr.App.1990), cert. denied, 581 So.2d 545 (Ala.1991), and apparently by a majority of the members of the Alabama Supreme Court, see Ex parte Dysart, 581 So.2d 545 (Ala.1991).

II.
The trial judge did not abuse her discretion in denying the appellant the unlimited right to question each venire memberse parately and individually.
"In Brown v. State, [571 So.2d 345, 349 (Ala.Cr.App.), cert. quashed, 571 So.2d 353 (Ala.1990), remanded, ___ U.S. ___, 111 S.Ct. 2791, 115 L.Ed.2d 966 (1991), on return to remand, 586 So.2d 991 (Ala.Cr.App.1991) ], this Court thoroughly examined this issue and recognized that the general rule is that `the decision whether to voir dire prospective jurors individually or collectively is within the sound discretion of the trial court.' However, this Court held that where the defendant demonstrates that the nature of the pretrial publicity raises a significant possibility of prejudice, and a veniremember acknowledges some exposure to that publicity, due process may require individual examination of each veniremember who has been exposed to the pretrial publicity about the extent of their knowledge of the case and may require an independent determination by the trial judge with regard to each veniremember as to whether the member's knowledge had destroyed his or her ability to be fair and impartial."
Kuenzel v. State, 577 So.2d 474, 484 (Ala. Cr.App.1990), affirmed, 577 So.2d 531 (Ala. 1991). In Brown, this Court held that the trial judge abused his discretion by not permitting individual voir dire under the circumstances of that particular case. This Court adheres to the principle that even in a death case, "[a]s a general rule, the decision whether to voir dire prospective jurors individually or collectively is within the sound discretion of the trial court." Brown, 571 So.2d at 349. See also Henderson v. State, 583 So.2d 276 (Ala.Cr. App.1990); Kuenzel v. State, 577 So.2d at 484. Furthermore, in Mu'Min v. Virginia, 500 U.S. ___, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991), the United States Supreme Court held that a defendant has no Sixth or Fourteenth Amendment right under the Constitution of the United States to question the prospective jurors about the specific contents of news reports to which they had been exposed.
Following the guidelines this Court set forth in Brown, we find that under the circumstances of this case, the trial judge did not abuse her discretion in either refusing to permit unlimited individual voir dire of each member of the jury venire or in refusing to permit defense counsel to question the venire members about the specific content of the media reports to which they had been exposed.
First, we find that the pretrial publicity in this case, although quite substantial, was not as extensive or as prejudicial as that present in Brown. The murder in this case occurred on March 18, 1988. Three people were involved in the commission of that murderÔÇöBilly Gray Williams, Kenneth Eugene Smith, and the appellant. These three individuals were allegedly hired by the victim's husband, Charles Sennett, a minister of the Church of Christ, to kill his wife, Elizabeth Dorlene Sennett. Mr. Sennett committed suicide on March 25, 1988, seven days after the murder.
In March and April 1988, there was extensive media coverage of the crime. The coverage continued to a lesser degree in May, June, and August. Williams was tried in January 1989 and was sentenced in February 1989. The media also covered the removal of Smith's trial to Jefferson County in March 1989. The appellant's trial began on May 30, 1989.
Although the crime in this case was horrible, it was not as sensational or lurid as that in Brown, which involved the brutal stabbing deaths of a mother and her ten-year-old daughter. At the time of the crime, Brown was on parole from a conviction *1079 of assault of his landlord. That assault had occurred while Brown was on parole from a conviction for having murdered his aunt, his grandmother, and his great-grandmother when he was 14 years old. See Brown, 571 So.2d at 350-51.
Second, in this case, the trial judge did allow individual and extensive voir dire of those venire members who indicated that they had formed an opinion about the case or who had a knowledge of the case from some source other than the media. However, the trial judge did not allow defense counsel to individually question each member of the venire who merely indicated that they had been exposed to some media report of the crime.
"THE COURT: ... I'm not going to grant the request with respect to individual voir dire of everyone who stood up and said they read something about it in the paper. I am going to grant the request with respect to people who after being asked that stood up and said that they had formed some conclusion about this and I have already granted that on the record. And if the Defendant wants to follow up with any more general questions and any more possible individual voir dire may arise from that I certainly will go ahead and consider [a] request at that time, but I do not think you have laid the proper predicate for individual voir dire of those people."
R. 663-64.
During the third day of jury selection, defense counsel renewed his motion for individual voir dire of every venire member who indicated that they had read or heard any media report of the crime. The trial judge responded:
"THE COURT: Let me just say this; I'm going to overrule the motion at this time. If you do not ask it tomorrow I'm going to ask a general question one more time, if there's anybody who has thought about it because it is obvious that people think about this overnight and then think about something the next morning and I think the question should be asked and if you don't do it or you don't do it I'm going to do it; if there is anybody who has thought about it overnight who thinks they may have a fixed opinion based onÔÇöor have an opinion or preconceived notion about this. I'm going to ask it or you can ask based on anythingÔÇöfor that matter, based on anything that they have read or based on anything that they have heard in court the last four days. You know, there may be some that think differently just because they've been in court for four days and heard what the questions are that you have asked them and I think it's an appropriate question to be asked. I just looked and most of the people who stood up and said they had read something about it in the media have already all been individually voir dired."
R. 885-86.
Finally, we note that the voir dire in this case was quite extensive and thorough, and that the attorneys themselves were permitted to ask their own questions. The voir dire in this case in no way compares with the almost cursory voir dire in Brown.
Our review convinces this Court that the trial judge did not abuse her discretion in denying defense counsel unlimited individual voir dire and in denying defense counsel's request to examine each venire member about the specific contents of any media report they had read or heard.
"[O]ur own cases have stressed the wide discretion granted to the trial court in conducting voir dire in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias. Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect, and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror. The trial court, of course, does not impute his own perceptions to the jurors who are being examined, but these perceptions should be of assistance to it in deciding how detailed an inquiry to make of the members of the jury venire." *1080 Mu'Min, 500 U.S. at ___, 111 S.Ct. at 1906.

III.
We also find that the trial judge did not abuse her discretion in denying the appellant's motions for change of venue.
The appellant filed his motion for a change of venue on May 16, 1988. During the hearing on that motion, it was stipulated that all the evidence, exhibits, testimony, and arguments given in the change of venue hearing in the case of the appellant's alleged accomplice, Billy Gray Williams, would be admitted into evidence in the appellant's case. The trial court denied this motion on August 10, 1988.
Following the trial and conviction of Williams on February 24, 1989, the trial judge set a hearing on the issue of venue, although there was no motion for change of venue pending at that time. The appellant filed an amended motion for change of venue on March 7, 1989. That motion was heard on March 9, 1989, after a different trial judge had granted a motion for a change of venue in the trial of Kenneth Eugene Smith, another alleged accomplice of the appellant. It was stipulated that all the exhibits involved in the Smith case would be admitted into evidence in the appellant's case. The appellant's amended motion for a change of venue was denied on March 21, 1989.
On this appeal, the attorney general admits that there was extensive media coverage of this crime.
"The exhibits submitted in support of John Parker's Motions for Change of Venue reveal intensive, detailed and widespread coverage of the death of Elizabeth Dorlene Sennett, the suicide of Charles Sennett, the arrest and the alleged confessions of Billy Gray williams, Kenneth Eugene Smith and John Forrest Parker, and the trial of Billy Gray Williams (R. 2203-2421). These news stories were circulated and broadcast throughout Colbert County, Alabama, by newspapers, radio and television (R. 64-84). These stories covered the details of the alleged crime, and detailed John Parker's alleged involvement in the death of Elizabeth Dorlene Sennett, which implicated John Parker as having confessed to taking Elizabeth Dorlene Sennett's life and implied his guilt during the coverage of the Billy Gray Williams trial."
Appellee's brief at 114-15.
As best this Court can determine, the record indicates that ultimately 65 members of the 93-member venire indicated that they had some prior knowledge of the crime. Of that 65, 24 members indicated that their knowledge was from a source other than the news media, primarily conversations with other people. Of those 24, only two members were struck for cause due to their fixed opinions.
The appellant's accomplice Williams was tried approximately three months before the appellant. In Williams v. State, 565 So.2d 1233, 1237-38 (Ala.Cr.App.1990), this Court found that there was no error in the denial of the motion for change of venue in that case. The trial judge in Williams also presided over this case.
"Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned.... In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity.... Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue.... As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961):
"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'
"The standard of fairness does not require jurors to be totally ignorant of the *1081 facts and issues involved.... Thus, `[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.'"
Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985).
"An accused is entitled under  15-2-20 to a change of venue if he can demonstrate that he cannot receive a fair trial in the county where he is to be tried. It is well established in Alabama, however, that the existence of pretrial publicity, even if extensive, does not in and of itself constitute a ground for changing venue and thereby divesting the trial court of jurisdiction of an offense.... [J]urors do not have to be totally ignorant of the facts and issues involved in a particular case in order to reach an unbiased verdict.... To satisfy her burden of proof in the present case, [the defendant] had to establish that prejudicial pretrial publicity has so saturated Lamar County as to have a probable prejudicial impact on the prospective jurors there, thus rendering the trial setting inherently suspect. This required a showing that a feeling of deep and bitter prejudice exists in Lamar County as a result of the publicity....
"Whether to change venue is discretionary with the trial judge.... In determining whether there has been an abuse of that discretion, an appellate court reviews the trial judge's order de novo, without any presumption in favor of that order....
"... In Primm v. State, 473 So.2d 1149, 1155 (Ala.Crim.App.1985), the court, quoting Anderson v. State, 362 So.2d 1296, 1299-1300 (Ala.Crim.App.1978), correctly stated:
`"Generally newspaper articles which objectively report the commission of a crime, do not carry inflammatory headlines, and do not editorialize on the facts in a manner to inflame the community or create an atmosphere of prejudice are an insufficient basis on which to grant a motion for a change of venue. Gray v. State, 56 Ala.App. 131, 319 So.2d 750 (1975)."'
In Mathis v. State, [280 Ala. 16, 189 So.2d 564 (1966), cert. denied, 386 U.S. 935, 87 S.Ct. 963, 17 L.Ed.2d 807 (1967) ], the following is stated:
"`"In Godau v. State, 179 Ala. 27, 60 So. 908, 910 [1913], it was said: "`"So long as we have newspapers we may expect to have through them the report of crimes, and it is not to be unexpected that, when a homicide is committed ... the newspapers of the community, answering the public interest, will furnish the defendant with at least some material upon which to base an application similar to the one under discussion.'
"`"Also in McClain v. State, 182 Ala. 67, 62 So. 241, 243 [1913], it was said:
"`"`We are not prepared to concede... that the sensational language of a newspaper reporter or special correspondent used in "writing up" such cases ... may be safely taken as a reflection of general public sentiment; nor that it may be lightly assumed that such statements as those ... shown are capable of permanently molding and fixing the opinions of the more intelligent classes of the people to the extinction of their sense of fair play, and the suppression of their sober second thought.'
"`"The mere belief of the defendant or of his witnesses that he cannot receive an impartial trial is not sufficient to entitle him to a change of venue...."'
280 Ala. at 18, 189 So.2d at 566 (quoting Campbell v. State, 257 Ala. 322, 324-25, 58 So.2d 623 (1952)."
Ex parte Fowler, 574 So.2d 745, 747-48 (Ala.1990).
Applying the principles of Grayson and Fowler to this particular case, we find that the trial judge did not abuse her discretion in denying the appellant's motions for change of venue.
We note that at the hearing on the motion for new trial, the trial judge made *1082 reference to J. Colquitt, Judicial Use of Social Science Evidence at Trial, 30 Ariz. L.Rev. 51 (1988):
"Change of venue motion practice supplies one example of evidentiary or procedural rules which preclude, or at least divert attention from, the use of social science evidence. If prejudicial pretrial publicity sufficiently saturates and inflames a community, the court can presume prejudice and order a change of the trial site. Absent such widespread community prejudice, the defendant must prove atual juror prejudice. Usually actual prejudice must be shown during the voir dire of the jury. The voir dire may refute apparrent prejudice. Thus, trial judges may be reluctant to hold hearings on the motions prior to actual arrival of the venire. In fact, in State v. Herring [21 Ohio App.3d 18, 486 N.E.2d 119 (1984)], the trial court's order changing venue was vacated, and the matter was remanded for a `good faith effort' to seat a jury. Once the trial judge considers the voir dire proceedings, the value of public opinion surveys may shrink in significance or be destroyed altogether. Since voir dire is the court-preferred test for prejudice, and since change of venue is within the discretion of the court, the trial judge may focus less attention on social science evidence, such as public opinion polls, and simply await the outcome of the voir dire proceeding. Moreover, in some jurisdictions, the trial judge must await the results of voir dire."
30 Ariz.L.Rev. at 56-57 (footnotes omitted).

IV.
The trial judge did not commit error in denying the appellant's challenge for cause to venire members Almon Whitehead, Ovie Crosswhite, and Elma Watkins. Defense counsel was allowed to voir dire each of these venire members individually outside the presence and hearing of the other members.
Whitehead was a reserve state trooper who had received some information connected with the case from a friend who was a nurse at the emergency room when the victim's body was brought in and from a friend who was with the Alabama Bureau of Investigation and who took part in the investigation of the murder. Defense counsel was permitted to explore the content of what Whitehead knew and what he had been told. On examination, Whitehead made it clear that what he had been told would not influence his judgment and that his judgment would be based on the evidence presented at trial. The appellant argues that his "assurances are simply not credible." Appellant's brief at 51.
Watkins was a retired Sheffield police officer who expressed his opinion that capital punishment should be imposed for any kind of murder. However, he testified that he could base his decision on the evidence and "go with what the Judge said the law was."
Crosswhite expressed his personal views favoring capital punishment but indicated that he could set those views aside and "follow the law" as instructed by the trial judge.
"[A] proper challenge for cause exists only when a prospective juror's opinion or bias is so fixed that he or she could not ignore it and try the case fairly and impartially according to the law and the evidence." Ex parte Rutledge, 523 So.2d 1118, 1120 (Ala.1988). "[A] trial court's ruling on a challenge for cause based on bias is entitled to great weight and will not be disturbed on appeal unless there is a clear showing of an abuse of discretion by the trial court." Rutledge, 523 So.2d at 1120. Here, there is no showing that any of these three veniremembers had such a fixed opinion that it would bias the verdict or influence the decision. Siebert v. State, 562 So.2d 586, 595-96 (Ala.Cr.App.1989), affirmed, 562 So.2d 600 (Ala.), cert. denied, ___ U.S. ___, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990).
"In challenging a juror for cause, the test to be applied is that of probable prejudice.... While probable prejudice for any reason will serve to disqualify a prospective juror, qualification of a juror is a matter within the discretion of the trial court.... This Court must look to *1083 the questions propounded to, and the answers given by, the prospective juror to see if this discretion was properly exercised.... A reversal is not appropriate absent abuse of this discretion....
"Ultimately, the test to be applied is whether the juror can set aside her opinions and try the case fairly and impartially, according to the law and the evidence.... This determination, again, is to be based on the juror's answers and demeanor and is within the sound discretion of the trial judge. Thus, a prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and a verdict rendered according to the evidence."
Knop v. McCain, 561 So.2d 229, 232 (Ala. 1989). See also Wood v. Woodham, 561 So.2d 224, 227 (Ala.1989). "Thus, even though a prospective juror admits to a potential bias, if further voir dire examination reveals that the juror in question can and will base his decision on the evidence alone, then a trial judge's refusal to grant a motion to strike for cause is not error." Perryman v. State, 558 So.2d 972, 977 (Ala.Cr. App.1989).
We recognize that there are occasions where a juror's claim of freedom from prejudice and impartiality cannot be accepted and should not be believed. See Patton v. Yount, 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984). "[T]he simple extraction of an affirmative response from a potential juror does not necessarily absolve that juror of probable prejudice." Woodham, 561 So.2d at 228. However, we do not consider this to be such an occasion. Our review of the questioning of these three venire members by the trial judge, defense counsel, and the prosecutor convinces this court that each challenge for cause of these three venire members was properly denied.
"The qualification of a juror is a matter within the discretion of the trial court. Clark v. State, 443 So.2d 1287, 1288 (Ala.Cr.App.1983). The trial judge is in the best position to hear a prospective juror and to observe his or her demeanor. A trial judge's rulings on a juror's qualification are entitled to great weight on appeal and will not be disturbed unless clearly shown to be an abuse of discretion."
Ex parte Dinkins, 567 So.2d 1313, 1314 (Ala.1990).

V.
The trial judge properly refused to instruct the jury on murder as a lesser included offense of capital murder for hire because there was no rational basis for such an instruction. See Ala.Code 1975,  13A-5-41.
The trial judge instructed the jury on the charged offense of capital murder for hire and on the lesser included offenses of conspiracy to commit murder, assault in the first and second degree, and manslaughter. At trial, the appellant did not object to the trial judge's oral charge.
The State's evidence shows that the appellant participated in the murder of Mrs. Sennett and that he received financial compensation for his actions.
The appellant's defense was that he did participate in an assault on Mrs. Sennett but that he left her alive and that she was stabbed to death by Mr. Sennett after the assault had occurred. In his closing argument, defense counsel argued that there was "no question" that the appellant was guilty of assault and conspiracy to commit assault, but that the appellant was not guilty of murder.
Here, neither the evidence presented by the prosecution nor that presented by the defense provides a rational basis for a verdict of murder. Following the principles collected in Holladay v. State, 549 So.2d 122, 128-29 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989), we find that the trial judge properly refused to instruct the jury on intentional murder as a lesser included offense of the crime charged. See also Schad v. Arizona, ___ U.S. ___, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991).
*1084 Under any view of the evidence, there is no basis for an instruction on reckless murder as defined by Ala.Code 1975,  13A-6-2(a)(2), because the appellant's actions were directed solely at the victim and therefore did not "manifest[ ] extreme indifference to human life." Northington v. State, 413 So.2d 1169 (Ala.Cr.App.1981), cert. quashed, 413 So.2d 1172 (Ala.1982).

VI.
The appellant contends that the trial judge structured her oral charge to the jury so as to preclude the jury from considering the offense of manslaughter. In essence, the trial judge charged the jury that if they did not believe the appellant was guilty of capital murder, they "must next consider" whether he was guilty of conspiracy to commit murder, and then whether he was guilty of assault in the first degree, and then whether he was guilty of assault in the second degree, and then, "[i]f after consideration of the evidence or lack of evidence you are not satisfied that the defendant is guilty of the offense of capital murder, or conspiracy to commit murder, or assault in the 1st degree, or assault in the 2nd degree you must next consider the evidence as to the lesser included offense of manslaughter."
There was no objection to the trial judge's charge on this matter. This is not a case of plain error. "When a greater and a lesser included offense are charged, the proper course is for the trial judge to instruct the jury to consider first the greater offense and then consider the lesser offense only if a reasonable doubt exists concerning the accused's guilt of the greater offense." Bragg v. State, 453 So.2d 756, 759 (Ala.Cr.App.1984) (emphasis in original). See also Lindsey v. State, 456 So.2d 383, 387 (Ala.Cr.App.1983) ("The trial court's instruction to this effect, that the jury should not consider the lesser included offenses unless it found the appellant `not guilty' of the capital offense was in accordance with and justified by [ 13A-5-41]"), affirmed, 456 So.2d 393 (Ala.1984), cert. denied, 470 U.S. 1023, 105 S.Ct. 1384, 84 L.Ed.2d 403 (1985).
Here, the jury could logically and reasonably find that the appellant was not guilty of any degree of assault because the victim was killed, but that the appellant was guilty of manslaughter because the victim's death was caused by the appellant's participation. The appellant's argument is without merit.

VII.
There is no plain error in the trial judge's oral instructions on conspiracy to commit murder.
The trial judge fully explained and defined the offenses of capital murder for hire and conspiracy to commit murder. No objection was made at trial.
The portion of the judge's charge to which the appellant now objects is as follows:
"The difference between the charge of capital murder and conspiracy to commit murder is the additional element in capital murder that the killing must be done for pecuniary, that is for money, or other valuable consideration."
R-1650.
Taken out of context and isolated, this is an improper statement of law because there are a number of distinctions between the elements of offenses of conspiracy to commit murder and capital murder for hire. However, "[t]he rule is well established that where a portion of the oral charge is erroneous, the whole charge may be looked to and the entire charge must be construed together to see if there be reversible error." Gosa v. State, 273 Ala. 346, 350, 139 So.2d 321, 324 (1961). "An instruction explanatory of another charge should be considered in connection therewith; and if, when considered together, they assert a correct proposition, the judgment will not be reversed, though the explanatory charge, as a separate and disconnected instruction, may not express all the elements of the proposition." Johnson v. State, 81 Ala. 54, 55, 1 So. 573, 574 (1886). See also Williams v. State, 538 So.2d 1250, 1252 (Ala.Cr.App.1988). When placed in the context of the entire oral charge, the portion *1085 of the charge quoted above does not constitute plain error.
These same principles apply to the trial judge's instructions on the element of intent in connection with the offense of capital murder. The charge on intent, "taken as a whole, was correct." Ex parte Dolvin, 391 So.2d 677, 680 (Ala.1980). The jury was properly and adequately charged on the necessity of a "particularized intent to kill." Ex parte Raines, 429 So.2d 1111, 1112-13 (Ala.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983). See also Ala.Code 1975,  13A-5-40(c).

VIII.
The trial judge did not violate the holding of Cage v. Louisiana, ___ U.S. ___, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), in instructing the jury on reasonable doubt. In that case, the jury was instructed that a reasonable doubt "must be such doubt as would give rise to a grave uncertainty," that "[i]t is an actual substantial doubt," and that a finding of guilt requires a requiring "moral certainty." ___ U.S. at ___, 111 S.Ct. at 329 (emphasis omitted). The objectionable language in the instruction involves the combination of the words "grave uncertainty," "actual substantial doubt," and "moral certainty" which "suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard." ___ U.S. at ___, 111 S.Ct. at 329-30.
In this case, the trial judge employed the terms "actual and substantial doubt" and "moral certainty" in defining reasonable doubt. However, her instructions did not employ the term "grave uncertainty." Here, as in Gaskins v. McKellar, ___ U.S. ___, 111 S.Ct. 2277, 114 L.Ed.2d 728 (1991) (Stevens, J., concurring in the denial of certiorari), the instructions do not contain the same flaw as the instructions in Cage.
"We have specifically examined petitioner's claim that the trial court's instruction to the jury on `reasonable doubt' was `plain error.' In that examination, we have compared the trial court's jury instruction regarding `reasonable doubt' with the instruction recently reviewed by the United States Supreme Court in Cage v. Louisiana, ___ U.S. ___, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), and condemned by that Court as violative of Cage's constitutional rights. The instruction given in this case does not contain the same infirmity that the Supreme Court of the United States found in the trial court's instruction in Cage. We hold, therefore, that there is no `plain error' affecting the substantial rights of the petitioner, and thus, no legal reason to grant the petitioner a new trial." Ex parte White, 587 So.2d 1236 (Ala.1991).

IX.
The appellant contends that the prosecution failed to disclose other convictions of state's witness Teddy Lynn White in addition to his conviction for burglary, and that the prosecution failed to disclose the fact that White was given favorable treatment in exchange for his testimony.
Five days before jury selection proceedings began, the prosecutor copied his entire file and gave it to defense counsel. R. 105-06. See Ex parte Monk, 557 So.2d 832 (Ala.1989). Apparently, either on that occasion or on an earlier date, the prosecutor gave the defense a copy of White's statement containing his admission that he had been convicted for burglary. Immediately before White testified at trial, defense counsel complained that the State had not given the defense any exculpatory information and that the defense did not have any information "of what [White's] criminal record is." R. 1474.
At trial, White testified as a witness for the State to the effect that a week or two before the murder, the appellant had attempted to purchase a gun from White. White testified that the appellant said "he was going to kill somebody. Said that him and Kenny Smith was getting $9000 each." R. 1482. On direct examination, White was specifically asked whether and admitted that he had been convicted of a felony "on more than one occasion." R. 1483 (emphasis added). On cross-examination, White testified that all of his convictions *1086 had been for burglary, and that he presently was in prison for third and second degree burglary. White testified that he had not been promised anything in exchange for his testimony, and that, in fact, while he was in the county jail, "[t]hey [were] talking about putting more charges on [him]." R. 1487-88.
At the hearing on the motion for new trial it was discovered that, at the time he testified, White was serving time for four convictions, all received on February 23, 1989, in Lauderdale County: burglary in the third degree, unlawful breaking and entering of a vehicle, theft of property in the second degree, and receiving stolen property in the second degree. R. 2667. It was also discovered that White had a prior burglary felony conviction (R. 1893) for which he had been incarcerated in 1985.
With regard to this issue, the district attorney's position was that the defense knew that White had prior convictions and that the defense could have discovered those convictions on their own. The district attorney argued that his office "is not obligated to go out and get material or obtain materials for the defense," and that his office "can't be charged with the knowledge or information that every State agency in the State of Alabama has." R. 1918.
At the hearing on the motion for new trial, it was also established that White, who testified in the appellant's trial on June 6, 1989, was approved for release on the Supervised Intensive Restitution (SIR) Program on June 12, 1989, and was released on the SIR program on June 14, 1989. The evidence shows that White was originally scheduled for release on May 24, 989, but that that release was held up on May 19, 1989, which was the same date White gave a statement concerning the appellant to Investigator Ed Sasser at the Elmore Correctional Facility. The "hold up" was "[a]pparently because of a protest from Mr. Steve Graham who is the District Attorney in Lauderdale County." R. 1846. (The appellant was prosecuted by the district attorney of Colbert County.) However, White was placed on SIR despite the protest of the district attorney.
A supervision officer for the SIR program testified at the hearing that to his knowledge White was not afforded any kind of "favor" or award in being placed on the SIR program in exchange for his testimony. He testified that this case "is not unusual. It is typical of basically the way most of them go."
White testified at the hearing that he was not promised anything for his testimony and that while he was in jail in Lauderdale County the jailer told him that "they was going to bring up some more charges on me." R. 1876-77. However, a detective told him that "they were still investigating and if they did come up with some more then he would let me know about it. And as far as he knew he wasn't going to bring anything against me as far as anything that he had." R. 1877. White testified that he was not offered or promised anything in exchange for his testimony. R. 1884. Investigator Ray also testified that he was not aware of any promise made to White in exchange for his testimony.
The appellant's discovery rights under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were not violated because the prosecutor is not required to disclose evidence he does not possess. "While it is true that under Brady the good faith of the prosecutor in not disclosing information is irrelevant, 373 U.S. at 87, 83 S.Ct. at 1196, Brady does require that the information requested be known to the prosecution. United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); Antone v. Strickland, 706 F.2d 1534, 1544 (11th Cir. 1983) (Kravitch, J., concurring specially) [, cert. denied, 464 U.S. 1003, 104 S.Ct. 511, 78 L.Ed.2d 699 (1983) ].... [T]hat knowledge may be presumed, as when the information is in the prosecutor's files, see Agurs, 427 U.S. at 110, 96 S.Ct. at 2400." United States v. Walker, 720 F.2d 1527, 1535 (11th Cir.1983), cert. denied, 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984).
Here, there is no evidence that the prosecution suppressed any evidence whatsoever. The contention that White's testimony was secured by a promise of favorable *1087 treatment in regard to SIR is supported only by a coincidence of facts interpreted through conjecture and speculation. The defense knew before trial that White was going to testify. There is no evidence that the prosecution had obtained White's complete criminal record or that the prosecutor had knowledge of all of White's prior criminal convictions.

X.
On direct examination, White could not identify the exact date on which the appellant came to his residence seeking to purchase a firearm. On cross-examination, defense counsel attempted to establish that White's testimony was based on information he had read in the newspaper. On redirect examination, the following occurred:
"Q. But you don't know the exact date for certain do you?
"A. No.
"Q. But do you remember the day that you heard on the car radio about the killing?
"A. Yeah, because I went to John's house. I went and bought a bag of pot from John."
R. 1486-87.
Immediately, defense counsel approached the bench, made a motion to strike White's answer as "not responsive and ... prejudicial," and requested a mistrial. When those motions were overruled by the trial judge without comment, defense counsel requested the judge to "instruct the jury to disregard that statement." That request was also denied.
White's nonresponsive answer was inadmissible under the general principles excluding evidence of crimes not charged in the indictment. C. Gamble, McElroy's Alabama Evidence  69.01 et seq. (4th ed. 1991). We reject the attorney general's argument that evidence that the appellant sold "pot" was admissible to show intent to commit murder. However, the error in the admission of White's comment was harmless under Rule 45, A.R.App.P.
In his opening comments, defense counsel stated:
"When [the appellant] did recover [from a fall] it affected his brain to a certain extent and that at approximately age 6 he was placed on Ritalin which is a veryÔÇöcan be a very helpful drug. It is definitely a very dangerous drug. When his parents and the doctors tried to remove him from Ritalin at age 12 John went to drugs. He was on drugs and alcohol from that age until the time of the event that he's charged with. So you can see what we're having to deal with in terms of preparing this case."
R. 942. The appellant's statement was properly admitted into evidence and contains the following references to drug use:
"During this portion of the conversation I [Investigator May] asked him if he hadÔÇöwas using any kind of drugs and he said he was not that day, on the 31st is when we're talking about. I asked him if he was a drug addict and he said he was, but that he had not used any narcotics on the 31st.... He stated that on the way down [to the Sennett residence on the day of the killing] that he shot up 3cc of Talwin.... He stated [that] he had been given a hundred dollars the day before to go buy a handgun and that he had spent that on drugs to shoot up."
R. 1416-17, 1420. In closing argument, defense counsel argued:
"John was taking drugs. There's no doubt about it. He's a drug addict. He's got a long history. He took some that day."
R. 1600.
We recognize that the crimes of possession and distribution of an illegal substance are two separate and distinct offenses. See Dortch v. State, 41 Ala.App. 349, 133 So.2d 43, cert. denied, 272 Ala. 703, 133 So.2d 44 (1961), but see Woods v. State, 437 So.2d 636 (Ala.Cr.App.1983). Thus, strictly speaking, it cannot be said in this case that evidence that the appellant sold a "bag of pot" is cumulative of evidence that he was a drug addict and used controlled substances. However, we find no ground for reversal for three reasons. First, from the *1088 arguments made by defense counsel and from the appellant's statement, it is undisputed that the appellant has serious problems with drugs and is a drug addict. Second, White's admission that he purchased marijuana from the appellant was just as prejudicial to White as it was to the appellant. Third, the comment was but a single isolated incident which was not exploited by the prosecution.

XI.
The appellant maintains that his warrantless arrest at his home was illegal because it was without probable cause. He also argues that because his arrest was illegal, his subsequent statement was inadmissible.
In Williams v. State, 565 So.2d 1233, 1236 (Ala.Cr.App.1990), this Court found that there was probable cause to arrest the appellant's accomplice. "The information obtained from the anonymous telephone informant and corroborated by the sheriff's department satisfies the totality-of-the-circumstances test for determining probable cause set out in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)." Williams, 565 So.2d at 1235. The facts supplying the probable cause for the arrest of Williams, Smith, and the appellant are virtually identical.
We find that, based on the specific facts presented in this case, the corroboration of the anonymous telephone informant supplied probable cause for this particular appellant's arrest. See Alabama v. White, ___ U.S. ___, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).
In determining the legality of the appellant's arrest, this Court need not decide whether the appellant was actually arrested inside his home or whether any warrantless arrest of the appellant at his home constituted a violation of Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The statements of the appellant were given to Investigator May at the county courthouse. In New York v. Harris, 495 U.S. 14, ___, 110 S.Ct. 1640, 1644-1645, 109 L.Ed.2d 13 (1990), the United States Supreme Court held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of Payton." Therefore, the appellant's statements at the courthouse would have been admissible even if this Court were to accept the appellant's argument that he was arrested without a warrant inside his residence.

XII.
The appellant argues that his statement was involuntary because he was under the influence of marijuana and alcohol at the time the statement was given and because he had an IQ of 78, which is just above mental retardation. Appellant's brief at 82-83.
However, just as there was evidence that the appellant's judgment was impaired, there was contradictory evidence that the appellant knowingly, voluntarily, intelligently, and repeatedly waived his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In addition, the State's evidence is that the appellant requested to speak to Investigator Ray and thereby initiated the taking of his statements.
We have reviewed the testimony adduced both at the hearing on the motion to suppress and at trial. In Williams v. State, 461 So.2d 834, 838 (Ala.Cr.App.1983), reversed on other grounds, 461 So.2d 852 (Ala.1984), this Court collected the principles of appellate review of a trial judge's determination of the admissibility of a confession or statement based on conflicting evidence of voluntariness. Applying those principles to the facts of this case, we find no error in the admission of the appellant's statement. "Before a confession is admissible, the trial judge must be satisfied by a preponderance of the evidence that it was voluntarily made.... This finding will not be disturbed on appeal unless it is evident that the determination was palpably contrary to the weight of the evidence." Ex parte Singleton, 465 So.2d 443, 445 (Ala. *1089 1985). See also Jackson v. State, 562 So.2d 1373, 1380 (Ala.Cr.App.1990).

XIII.
The appellant complains about the admission into evidence at trial of expert testimony concerning hair samples from himself and from Kenneth Smith.
At the scene of the crime, investigators discovered hairs in a cap located near Mrs. Sennett's body and on an afghan partially covering her body. The appellant and Smith were arrested on March 31, 1988. Hair samples were taken from both Smith and the appellant by Investigator Doug Hargett, who placed each sample in a separate envelope and mailed both envelopes to state criminologist John Kilbourn at the crime lab in Huntsville, Alabama. Kilbourn received the envelopes on April 5, 1988, and compared the known hair samples taken from the appellant and Smith with those found at the scene of the crime. At trial, the envelope that had previously contained Smith's known hair sample was discovered to be empty. However, Kilbourn was permitted to testify that the hairs from the cap and the afghan "were all found to be consistent with the known hair of Kenneth Eugene Smith." R. 1355. Kilbourn also testified that at the time he received the envelope identified as State's Exhibit 40, the envelope was sealed and did contain "several hairs." R-1353.
The appellant objected at trial on the ground of "best evidence." On appeal, he argues that the testimony concerning the hair samples was inadmissible because: 1) the hairs "were not available for inspection, testing or verification"; 2) there was a break in the chain of custody of State's Exhibit 40; 3) the hair seized from the appellant was taken without the appellant's consent; and 4) the appellant's hair sample was "irrelevant" because there was "no evidence tying his hair sample with any of the hair samples recovered from the scene." Appellant's brief at 86. Each of these arguments is without merit.
First, the fact that Smith's hairs were not present at trial caused no prejudice to the appellant. It is significant that the evidence missing in this case was not the unknown hairs discovered at the scene of the crime, but the known hairs of the appellant's suspected accomplice. There is no contention that the State deliberately "lost" the hair sample or that the known sample was not Smith's hair. There is no contention that before trial the appellant was not familiar with the results of the expert's comparison of the hair from both Smith and the appellant.
Second, although there was no explanation of what happened to the missing hair, there was no break in the chain of custody of State's Exhibit 40, the envelope containing Smith's hair. Each link in the chain was accounted for from the time the hair was seized until the time of trial. See Murrell v. State, 377 So.2d 1102, 1106-07 (Ala.Cr.App.) (fact that bullet was missing from sealed package containing cylinder switch from pistol found at scene did not preclude admission of switch into evidence), cert. denied, 377 So.2d 1108 (Ala.1979). Here, as when dealing with a controlled substance, "the law is concerned with tracing the integrity of the substance only up through the completion of the analysis." Congo v. State, 409 So.2d 475, 479 (Ala.Cr. App.1981), cert. denied, 412 So.2d 276 (Ala. 1982). "Any alteration or substitution of the items after [the expert] finished her analysis and comparison would, therefore, have been immaterial." Blanco v. State, 485 So.2d 1217, 1219 (Ala.Cr.App.1986).
Third, considering the facts that there was probable cause to seize a sample of hair from the appellant and that the appellant was in lawful custody, this Court considers the seizure of a sample of the appellant's hair to "constitute such a minor intrusion that ... [it] is inherently reasonable." 2 W. LaFave, Search and Seizure  5.3(c) at 498 (2d ed. 1987).
"Courts have also permitted the warrantless taking of [head] hair samples from a person in custody, finding that the hair is a feature constantly exposed to the public for which a person has little reasonable expectation of privacy. Since the person is already in police custody, *1090 there is no reason to obtain any judicial process to conduct the seizure of the hair."
W. Ringel, 2 Searches & Seizures, Arrests and Confessions  18.2(a) at 18-5 (2d ed. 1990) (footnote omitted). The Miranda warnings are not required before the taking of a hair sample from a person in lawful custody because the sample is not "`testimonial' or `communicative' evidence as required by the Supreme Court in order for the Fifth Amendment privilege to apply." 2 Ringel at  26.5(d) at 26-29. See Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).
Fourth, the fact that the hair sample taken from the appellant did not connect the appellant with the commission of the crime did not render testimony about that hair sample irrelevant. This was a case based on circumstantial evidence. The fact that no hair found at the scene was consistent with the appellant's hair was a circumstance that the prosecution was entitled to present to the jury in the State's portrayal of the manner in which the crime was allegedly committed. Under the liberal test of admissibility in Alabama, "a fact is admissible if it has any probative value, however slight, upon a matter in the case." McElroy's  21.01 at 34. "Evidence as to the scene of a crime, as to objects found thereat, and as to the condition of the body, is admissible and relevant evidence, when reasonably proximate to the scene in time and location." Petty v. State, 40 Ala.App. 151, 154, 110 So.2d 319, 322 (1958), cert. denied, 269 Ala. 48, 110 So.2d 325 (1959). Evidence as to objects found at or near the scene of the crime charged within a reasonable time and proximity after the commission of the crime is "always admissible." Busbee v. State, 36 Ala.App. 701, 703, 63 So.2d 290, 292 (1953).

XIV.
The appellant objects to the admission of photographs of a video cassette recorder (VCR) found in the residence of Kenneth Smith on the grounds that the identification of that VCR as the same VCR that was missing from the Sennett residence was based on hearsay information. This argument is grounded on Investigator May's testimony that the only information he had about the serial number of the VCR was information that he had received from a member of the Sennett family.
"Q. [defense counsel]: Did any information which you have gathered about a VCR as far as serial number or identification come from what somebody told you?
"A. [Investigator May]: It was given to us by a member of the family after the house was released.
"Q. Okay. So any information as to identifying it by make and serial number would be something that somebody has told you?
"A. No, sir, we have the box the VCR came in showing the serial number.
"Q. Where did you get the box?
"A. From a member of the family.
"Q. Okay, and they gave it to you?
"A. That's correct, sir.
"....
"Q. So your knowledge would come from what someone gave you, someone that was a member of the family and what people told you that were members of the family, is that correct?
"A. Yes, sir, they called us and advised they had the serial number of the VCR from the sales records.
"....
"Q. Did that serial number compare with the serial number that you had previously obtained from the Sennett family?
"....
"A. Yes, sir, it did."
R. 1405-06, 1409. The appellant's objection at trial was "on the grounds that this is hearsay and on the grounds of relevancy." R. 1406.
Neither the box showing the serial number nor the sales records were introduced into evidence. No one who had seen the VCR in the Sennett residence or who had firsthand knowledge of that fact testified. Investigator May did testify that a family *1091 member had not only told him the serial number but had delivered to him the actual box containing the serial number. Yet, the fact remains that the testimony connecting the box (and the sales receipt) with the particular VCR removed from the Smith residence was based on Investigator's May's inadmissible testimony of what a family member told him. See Whizenant v. State, 71 Ala. 383, 385 (1882); Bowden v. State, 542 So.2d 335, 339 (Ala.Cr.App.1989); Parker v. State, 386 So.2d 495, 496 (Ala.Cr. App.1980).
However, any error in the admission of this testimony was harmless. In relating the appellant's confession to the jury, Investigator May testified that the appellant "did say they [the appellant and Smith] took a VCR and he did state the following day that theyÔÇö[the appellant] found a stereo in his car that he threw in the river. He stated that Kenny took that VCR with him that afternoon." R. 1419. The appellant's defense was that he and Smith beat Mrs. Sennett but that they did not kill her. The testimony concerning the VCR merely proved that Smith, and inferentially the appellant, were at the Sennett residence. This was not a disputed fact at trial. In Beverly v. State, 281 Ala. 325, 330, 202 So.2d 534, 538 (1967), the Alabama Supreme Court held: "Thus appellant could not have probably been injured in any substantial right by the introduction of the bill of sale ... in that this evidence related to evidence not only uncontradicted but fully corroborated by the appellant himself in his confession." See also Alston v. State, 248 Ala. 163, 166, 26 So.2d 877, 879 (1946). We conclude that the admission of May's testimony concerning the serial number of the VCR "could not reasonably have contributed to [the appellant's] conviction and, therefore, was harmless." Ex parte Musgrove, 519 So.2d 586, 586 (Ala.1987), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988). "The rule is that testimony apparently illegal upon admission may be rendered prejudicially innocuous by subsequent legal testimony to the same effect or from which the same facts can be inferred." Yelton v. State, 294 Ala. 340, 342, 317 So.2d 331, 333 (1974).

XV.
The appellant argues that the trial judge erred in permitting prosecution witness Ivan Fike to testify as to the authenticity of business records that were not in his control.
Ivan Fike was the accounting supervisor for the Lister Hill Employees' Credit Union in Muscle Shoals, Alabama. He testified that he was "in charge of and considered custodian of the business records there." Through his testimony, the prosecution was permitted to introduce State's Exhibit No. 68, which was a copy of a cancelled check drawn against the credit union in the amount of $3,000 and made payable to Charles E. Sennett.
There was testimony that a check that is drawn on Lister Hill Employees' Credit Union is payable through the United States Central Credit Union in Wichita, Kansas. To obtain a copy of the check, Fike submitted a request to the Alabama Corporate Credit Union in Birmingham, Alabama, because "they're affiliated with the U.S. Central Credit Union." Fike testified that the original check had been destroyed in the normal procedures of the credit union and that "[t]he canceled check was microfilmed at U.S. Central Credit Union in Wichita, Kansas." He stated that the copy of the check was generated through records that are kept in the normal course of business. We find that this predicate was sufficient for the admission of the copy of the canceled check. See Reed v. Sears, Roebuck & Co., 44 Ala.App. 506, 508, 214 So.2d 857, cert. denied, 283 Ala. 717, 214 So.2d 861 (1968).
"Testimony by any witness, frequently the custodian of the record, that the document now exhibited to him is a record of the business; that he knows the method (i.e., the standard operating procedure) used in the business of making records of the kind now exhibited to him; and that it was the regular practice of the business to make records of such kind and to make them at the time of the event recorded or within such specified period thereafter as could be found by *1092 the trier of fact to be reasonable, is a sufficient authentication of the record to require its admittance in evidence."
McElroy's at  254.01(3).
"The [business records] rule does not require that the person who made the entry be the witness who lays the foundation for the introduction of the record into evidence. See Bailey v. Tennessee Coal, Iron & Railroad Co., 261 Ala. 526, 530-531, 75 So.2d 117, 120-121 (1954); Mahone v. Birmingham Electric Co., 261 Ala. 132, 135-136, 73 So.2d 378, 380-381 (1954). Any witness who knows the method used in the business of making records of the kind in question and knows that it was the regular practice of the business to make such records at the time of the event in question or within a specified reasonable time thereafter is competent to lay the foundation by testifying that the exhibit is such a record. Austin v. State, 354 So.2d 40, 42 (Ala. Civ.App.1977); C. Gamble, McElroy's Alabama Evidence,  254.01(3) (3d ed. 1977)."
Ikner v. Miller, 477 So.2d 387, 390 (Ala. 1985).

XVI.
Prosecution witness Donald Larry Buckman was properly allowed to testify that Smith asked him if he knew "where he could find a gun at." R. 1262. This statement was a portion of a conversation held in the presence of the appellant.
The prosecution presented a prima facie case that Smith and the appellant were both accomplices and co-conspirators. "Where proof of a conspiracy exists, any act or statement by an accused's co-conspirator in the commission of the crime, done or made before the commission of the crime, during the existence of the conspiracy and in the furtherance of a plan or design, is admissible against the accused." McElroy's at  195.03(1).

XVII.
The photographs and other evidence obtained from the appellant's automobile after his arrest were properly admitted into evidence.
"Nothing in the reasoning of [Payton v. New York] suggests that an arrest in a home without a warrant but with probable cause somehow renders unlawful continued custody of the suspect once he is removed from the house. There could be no valid claim here that [the appellant] was immune from prosecution because his person was the fruit of an illegal arrest. United States v. Crews, 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980). Nor is there any claim that the warrantless arrest required the police to release [the appellant] or that [the appellant] could not be immediately rearrested if momentarily released. Because the officers had probable cause to arrest [the appellant] for a crime, [the appellant] was not unlawfully in custody when he was removed to the station house, given Miranda warnings and allowed to talk. For Fourth Amendment purposes, the legal issue is the same as it would be had the police arrested [the appellant] on his door step, illegally entered his home to search for evidence, and later interrogated [the appellant] at the station house. Similarly, if the police had made a warrantless entry into [the appellant's] home, not found him there, but arrested him on the street when he returned, a later statement made by him after proper warnings would no doubt be admissible."
New York v. Harris, 495 U.S. at, 110 S.Ct. at 1643.

XVIII.
The photographs of the body of Mrs. Sennett were properly admitted into evidence.
"[P]hotographs depicting the character and location of wounds on a deceased's body are admissible even though they are cumulative and are based on undisputed matters. Magwood [v. State ], 494 So.2d [124, 141 (Ala.Cr.App.1985), affirmed, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986) ]. The fact that a photograph is gruesome is not grounds to exclude it *1093 as long as the photograph sheds light on issues being tried. Id. Also, a photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury. Id."

Ex parte Bankhead, 585 So.2d 112 (Ala. 1991). Accord, Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, ___ U.S. ___, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); McElroy's at  207.01(2).

XIX.
At trial, the prosecution introduced separate photographs of Williams, Smith, and the appellant. Each photograph depicted the shoulders and head of the subject in front of a lined height chart. No photograph contained a date, an identification number, or any indication that it was a "police photograph."
In Williamson v. State, 384 So.2d 1224, 1231 (Ala.Cr.App.1980), this Court found that a photograph depicting a frontal view of the subject with a height chart in the background was not objectionable as a "mug shot."
"The photograph presently before the court is vastly different from those in Holsclaw [v. State, 364 So.2d 378 (Ala. Cr.App.), cert. denied, 364 So.2d 382 (Ala. 1978)] and [United States v.] Harrington [490 F.2d 487 (2d Cir.1973) ]. In each of those cases the courts were considering the effects of `mug shots' consisting of juxtaposed frontal and profile views of the defendant complete with police identification numbers and name of police department. The particular photograph of the instant appellant consists of merely a frontal view of the defendant standing before a height chart. This rather innocuous photograph is devoid of markings which imply past criminal behavior.
"One cannot fairly say that the photograph in question was introduced in such a manner as to draw attention to its source or implications.
. . . . . .
"In sum, the introduction of the photograph of the appellant did not prejudice his right to a fair trial."
Williamson, 384 So.2d at 1231. "The presence of lines in a photograph [does] not mean that the person in the photograph is a criminal, has a criminal record, or has committed a crime involving moral turpitude." Lockett v. State, 518 So.2d 877, 880 (Ala.Cr.App.1987).

XX.
The appellant argues that the prosecutors' improper closing arguments deprived him of a fair trial and a reliable sentencing proceeding. There was no objection to any argument of the prosecutors either at the guilt or the sentence phase of the trial.
Because there was no objection at trial and because this is a death case, we must consider whether the prosecutors' remarks constitute plain error. "`Plain error exists when the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the proceedings...; in other words, `plain error' exists when a substantial right of the defendant has or probably has been adversely affected." Ex parte Smith, 581 So.2d 531, 532 (Ala.1991). Accord, Kuenzel v. State, 577 So.2d at 481-82. "`Error' is `plain error' only when it `has or probably has adversely affected the substantial rights of the [defendant],' Rule 39(k), A.R.App.P., and plain error is to be acted upon `in the same manner as if the defendant's counsel had preserved and raised [the] error for appellate review.' Johnson v. State, 507 So.2d 1351, 1356 (Ala.1986)." Ex parte White, 587 So.2d 1236 (Ala.1991).

A. GUILT PHASE ARGUMENT
Early in his closing argument at the guilt phase of the trial, the assistant district attorney stated:
"What do we have that would go toward tying John Parker to this crime. Of course, the most obvious things we've got is his statement. We got a confession from him. And I know good and well that you don't think that that statement *1094 came any other way but than the way Mr. May said it did. I've known Ronnie May for a long time and worked with him for a long time and, of course, when we put a witness on the witness stand we vouch for their credibility just as the defense does when they call a witness. But I can assure you right now that what Ronnie May testified to you aboutÔÇöabout anything, but particularly about the statement that I'm talking about right now that was given to him on March the 31st by Mr. Parker. I can assure you he told you the truth, what was told him by Mr. Parker. And I don't for any one minute think that any of y'all think he would get up and make it up or fabricate it or anything like that. But I can assure you, ladies and gentlemen, what he told you is the truth with regard to that statement."
R. 1575. That same assistant district attorney also stated:
"We've got other testimony [in addition to the statement]. We've got the testimony of Donald Buckman. Mr. Buckman came in here and testified before you and I can assure you he didn't have anything against John Parker."
R. 1576.
"Is that person [the forensic pathologist] best qualified to tell you about it, about the possible murder weapon or is it the doctor that worked on the person in the emergency room and was primarily trying to save her life. Again, I'm not try[ing] to in anyway run down Dr. McKinley. I know Dr. McKinley. He's a personal acquaintance of mine and I can assure he'sÔÇöwhen he came in here and said what he did the other day he was giving you his opinion, his best opinion, but again I say to you; who is best qualified to give that opinion?"
R. 1581-82.
In the State's final closing argument, the district attorney stated:
"There is no such thing as a case that you couldn't look at long enough and hard enough and find some kind of little inconsistency in the testimony and the reason for that is, I submit to you at least from the State's witnesses they were trying very hard to tell you the truth and the truth as they saw it. Like Mr. Hudson said, we vouch for the credibility of those witnesses by putting them on the stand and I submit to you that they've told the truth, ..."
R. 1611.
Obviously, the above-quoted comments of the prosecutors were improper attempts to bolster witnesses by vouching for their credibility.
"`Attempts to bolster a witness by vouching for his credibility are normally improper and error.' United States v. Ellis, 547 F.2d 863, 869 (5th Cir.1977). The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility. United States v. Roberts, 618 F.2d 550, 537 (9th Cir.1980) (citing Ellis, supra). This test may be satisfied in two ways. First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity. See United States v. Lamerson, 457 F.2d 371, 372 (5th Cir. 1972); Gradsky v. United States, 373 F.2d 706, 709-10 (5th Cir.1967). Secondly, a prosecutor may implicitly vouch for the witness' veracity by indicating that information not presented to the jury supports the testimony. See United States v. Brooklier, 685 F.2d 1208, 1218 (9th Cir.1982) (explaining United States v. Roberts, 618 F.2d 530 (9th Cir.1980))."
United States v. Sims, 719 F.2d 375, 377 (11th Cir.1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984). The question in this case is whether those comments constitute "plain error."
In Murry v. State, 562 So.2d 1348, 1353-56 (Ala.Cr.App.1988), this Court thoroughly considered a similar issue. Applying the principles there set out, we conclude that the prosecutors' arguments in this case do not constitute plain error. The remarks, although clearly erroneous, do not "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." Murry, 562 So.2d at 1354. Those remarks *1095 must be viewed in the context of the prosecutors' entire argument and in the course of the entire trial. "`"[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." `" Murry, 562 So.2d at 1354 (quoting United States v. Swafford, 766 F.2d 426, 428 (10th Cir.1985)). In his closing argument, defense counsel did not contend that the appellant's confession was false. Indeed, he argued that the appellant is "not denying that he was out there the 18th. His statement says he was." R. 1591. He also argued: "As I said, there's no question, John Parker and Kenny Smith were there and what did he tell Ronnie May. `We were going out there to commit a burglary.'" R. 1596.
Furthermore, as this Court stated in Murry, "we are confident that the remark[s] did not undermine the fairness of the trial, because any prejudice which might have resulted from the comment[s] was cured by the court's extensive cautionary instructions in its oral charge to the jury." 562 So.2d at 1355. In her instructions to the jury, the trial judge charged:
"In determining what the true facts are in the case, you are limited to the evidence that has been presented from the witness stand as opposed to matters that have been stated by the attorneys in the course of the trial. What the attorneys have said both for the State and for the Defendant is not evidence in the case. What they have argued to you at various points in the trial is not evidence. They have a right and they have a duty at the appropriate time in the trial to comment on the evidence and draw reasonable inferences from the evidence as they argue their respect[ive] positions to you. What they say is not evidence and you should put what they say in a proper category in your thinking and it should not be in the evidence category, just as the indictment in the case should not be in the evidence category."
R. 1641-42.
In addition, we find in this case, as we did in Murry, that:
"when the remark is considered in the context of defense counsel's arguments and subsequent instructions by the court, it did not `induce the jury to trust the Government's judgment rather than its own view of the evidence.' [United States v. Young, 470 U.S. 1, 18-19, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985)]. Finally, while the failure to object certainly does not preclude review in a capital case, it does weigh against any claim of prejudice. See, e.g., Ex parte Bush, 431 So.2d 563 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983)."
562 So.2d at 1355-56.
We find that other remarks of the prosecutors which are objected to on appeal for the first time were within the range of legitimate argument and do not constitute improper comment.

B. SENTENCE PHASE
The appellant complains that during the prosecutor's argument during the sentence phase of the trial, the prosecutor improperly 1) urged the jury to recommend death based upon unsubstantiated allegations of criminal behavior that had never been charged nor proven, 2) exhorted the jury to "do the right thing" and to sentence the appellant to death, and 3) argued that the appellant would kill again.
Even accepting the appellant's contention that these comments constituted error, which we do not, any error would be harmless because the jury, by a vote ten to two, recommended life without parole. The present situation is analogous to that in Leverett v. State, 462 So.2d 972, 977 (Ala. Cr.App.1984), where this Court stated:
"[T]he verdict clearly indicates that the jury was not in any manner inflamed or influenced by these bits of evidence. See Morgan v. State, 35 Ala.App. 269, 45 So.2d 802 (1950). Error in the admission of evidence which is shown by the verdict *1096 to have had no effect on it or to have caused the defendant no prejudice is not reversible. 24B C.J.S. Criminal Law  1915(13) (1962). Thus, there is no reversible error where the defendant was acquitted of the offense with respect to which the improper evidence was admitted, although he was convicted of another offense. Id. See also Middleton v. State, 27 Ala.App. 564, 176 So. 613, 614 (1937); Hanson v. State, 27 Ala.App. 147, 168 So. 698, 700, cert. denied, 232 Ala. 585, 168 So. 700 (1936); Lee v. State, 16 Ala.App. 53, 75 So. 282, 283 (1917)."
See also Johnson v. Dugger, 911 F.2d 440, 448, n. 13 (11th Cir.1990)[1] ("Here, however, the sentencing jury returned an advisory sentence of life imprisonment. Hence, any errors in the advisory jury's perception of what constituted mitigating factors would be harmless.").

XXI.
This Court rejects the appellant's argument that his motion for judgment of acquittal should have been granted because the prosecution failed to prove that the appellant received any "pecuniary or other valuable consideration, to wit: $1,000.00" as charged in the indictment.
The trial judge, in her written order on imposition of the death penalty as required by Ala.Code 1975,  13A-5-47(d), made the following findings of facts:
"The court finds from the evidence introduced at trial that the defendant, John Forrest Parker, and his friend, Kenneth Eugene Smith, on the morning of March 18, 1988, went to the home of Elizabeth Dorlene Sennett in rural Colbert County, Alabama, with the intent to kill said Elizabeth Dorlene Sennett.... [T]hat the day before, Billy Gray Williams had paid the defendant the sum of One Hundred and No/100 ($100.00) Dollars to use for purchasing a weapon to be used in said murder, but that the defendant used that money for drugs to `shoot up.' ... [T]hat the defendant was promised $1,000.00 for the killing by ... Williams, and that he would be paid the balance when the job was done.... [T]hat ... Smith and the defendant ... drove to the residence of Elizabeth Dorlene Sennett in the defendant's vehicle.... [T]hat the defendant shot up 3 cc's of Talwin on the way to said residence.... [T]hat the defendant had been unsuccessful in securing a gun for `the job' and that he brought with him a survival knife.... [T]hat the defendant drove his vehicle to Elizabeth Sennett's home and that ... Smith sharpened the defendant's knife all the way down there.... [T]hat they parked the defendant's car in the rear of the Sennett home.... [T]hat the defendant and Mr. Smith asked Elizabeth Sennett for permission to use the bathroom, which she gave them. While in the bathroom, the defendant put cotton socks on his hands.... [T]hat when he came out of the bathroom the defendant jumped Elizabeth Dorlene Sennett and started hitting her and together he and Kenneth Eugene Smith killed her by hitting her with a galvanized pipe, holding her down with a small blue chair and stabbing her while she was asking them not to hurt her.... [T]hat the defendant and ... Smith took a VCR and a stereo to make it look like a burglary, which was in accordance with their plan, and that they also broke the glass in the medicine cabinet to further this plan.... [T]hat the defendant and ... Smith threw away the survival knife they had used for the killing, and that the defendant threw the stereo off a bridge and burned his clothes after the killing. The Court further finds that the defendant was paid the additional $900.00 after the killing."
R. 2152-53.
Specifically, the prosecution presented evidence that on March 17, 1988, the day before the murder, Charles Sennett cashed a check for $3,000. Teddy Lynn White testified that some relatively short period *1097 of time before the murder the appellant told him that somebody had hired him and Smith to kill somebody for some money. In his confession, the appellant admitted that Mr. Sennett had hired him to kill Mrs. Sennett for $1,000.
In White v. State, 546 So.2d 1014, 1016-17 (Ala.Cr.App.), this Court summarized the legal principles involved in the appellate review of the sufficiency of circumstantial evidence. Applying those principles to the facts of this case, we find that the evidence was clearly sufficient to support the appellant's conviction. The evidence supports the finding that the appellant "did intentionally cause the death of Elizabeth Dorlene Sennett, by beating her and stabbing her with a knife, for a pecuniary or other valuable consideration, to wit: $1,000.00, in violation of 13A-5-40(a)(7) of the Code of Alabama" as charged in the indictment. "To prove the corpus delicti it is not necessary to prove that the victim's death was occasioned by the criminal agency of the defendant.... Once there is independent evidence of the corpus delicti, a confession is not required to be corroborated.... The confession of accused, alone, may be sufficient to show his connection with the homicide if the corpus delicti is established by other evidence." Johnson v. State, 378 So.2d 1164, 1170 (Ala.Cr.App.), cert. quashed, 378 So.2d 1173 (Ala.1979) (citations omitted). However, in this case we note that there exists independent evidence of the corpus delicti of the charged offense and the appellant's confession was corroborated by other evidence. The appellant's conviction does not rest on his own uncorroborated confession.

XXII.
The appellant argues that the trial judge should have granted his motion to recuse because that judge, in sentencing Billy Gray Williams to life imprisonment without parole, had determined that Williams had hired the appellant and Smith to murder Mrs. Sennett, that the appellant and Smith had actually murdered Mrs. Sennett, and that the appellant and Smith had been paid for the contract killing. The appellant argues that the trial judge was biased and prejudiced and had prejudged his case because she had been the judge in the trial of the appellant's alleged accomplice Williams, who was tried and convicted prior to the appellant's trial.
We hold that the trial judge who presided over the appellant's trial for capital murder was not disqualified because that same judge had previously presided over the trial of the appellant's alleged accomplice in the commission of the same murder for hire.
"To disqualify a judge for bias, the bias must be shown to be personal." Ex parte Whisenhant, 555 So.2d 235, 238 (Ala.1989), cert. denied, ___ U.S. ___, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990).
"[T]he fact that the trial judge had presided over the defendant's previous two sentencing trials was not grounds for disqualification. A trial judge need not recuse himself solely on the ground that he was the `same trial judge who had heard the case and imposed the death penalty' in a defendant's prior trial. Ex parte Whisenhant, 482 So.2d 1241, 1245 (Ala.1983)."
Whisenhant, 555 So.2d at 238.
"Ordinarily, a judge's rulings in the same or a related case may not serve as the basis for a recusal motion. Jaffe v. Grant, 793 F.2d 1182, 1189 (11th Cir. 1986), cert. denied, 480 U.S. 931, 107 S.Ct. 1566, 94 L.Ed.2d 759 (1987). The judge's bias must be personal and extrajudicial; it must derive from something other than that which the judge learned by participating in the case. Id. at 1188-1189. An exception to this general rule occurs when the movant demonstrates `pervasive bias and prejudice.' Id. at 1189 (quoting United States v. Phillips, 664 F.2d 971, 1002-03 (5th Cir., Unit B (1981), cert. denied, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982)."
McWhorter v. City of Birmingham, 906 F.2d 674, 678 (11th Cir.1990). In this case, the appellant has made no showing of pervasive bias and prejudice and this Court has found no indication that such was present. Our independent review of the *1098 record convinces this court that the trial judge was fair and impartial.

XXIII.
The appellant contends that the trial judge's rejection of the jury's recommendation of life imprisonment without parole and her imposition of the death penalty was unconstitutional and resulted in the arbitrary and standardless imposition of the sentence of death.
The appellant's argument that the jury override provision of the Alabama statutory sentencing scheme, Ala.Code 1975,  13A-5-47(e), is unconstitutional is without merit. Spaziano v. Florida, 468 U.S. 447, 464-65, 104 S.Ct. 3154, 3164-65, 82 L.Ed.2d 340 (1984). Frazier v. State, 562 So.2d 543, 550 (Ala.Cr.App.), reversed on other grounds, 562 So.2d 560 (Ala.1989), and cases cited therein.
Tedder v. State, 322 So.2d 908, 910 (Fla.1975), requires that in order for a trial judge to reject a jury's recommendation of life without parole, "the facts suggesting a sentence of death [must be] so clear and convincing that virtually no reasonable person could differ." The "Tedder standard" is not constitutionally required. Johnson v. Dugger, 911 F.2d at 452;[2]Ex parte Jones, 456 So.2d 380, 382 (Ala.1984), cert. denied, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985). The appellant has advanced no reason or argument to convince this court otherwise.

XXIV.
Error is found in the sentencing proceedings.
The trial judge properly found the existence of the aggravating circumstance that "[t]he capital offense was committed for pecuniary gain." Ala.Code 1975,  13A-5-49(6). The trial judge found that "none of the other aggravating circumstances set out in Section 13A-5-49 of the Code of Alabama, as amended, were proven to exist in this case." R-2153. However, the trial judge failed to "enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in section 13A-5-49," as required by Ala.Code 1975,  13A-5-47(d) (emphasis added).
The trial judge found the existence of only one statutory mitigating circumstance: "The court finds one mitigating circumstance in this cause to be the age of the defendant at the time of the commission of the crime, to-wit: 19 years." R.2154.  13A-5-51(7).
The trial judge improperly rejected the mitigating circumstance of  13A-5-51(1) that "[t]he defendant has no significant history of prior criminal activity":
"The Court further finds that although the defendant does not have a criminal record, he does have a history of criminal activity. The Court finds that the defendant illegally possessed and used illegal drugs and had done so for many years. His mother testified that he had stolen gas from one of his employers at one particular time. His illegal drug use is a significant factor in this defendant's behavior. In fact the defendant was on Talwin when this murder was committed."
R. 2154. This was an improper reason for the rejection of this mitigating circumstance. In Cook v. State, 369 So.2d 1251, 1257 (Ala.1978), "the Alabama Supreme Court held that only convictions can be used to negate the statutory mitigating circumstance of no significant history of prior criminal activity." Hallford v. State, 548 So.2d 526, 544 (Ala.Cr.App.1988), affirmed, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). The attorney general confesses error in this matter but argues that the error was harmless. Appellee's brief at 143-51. Because the sentencing order of the trial judge contains other errors, we decline to reweigh the proper mitigating and aggravating circumstances or apply a harmless error analysis to this case as we did in Lawhorn v. State, 581 So.2d 1159 (Ala.Cr. App.1990), affirmed, 581 So.2d 1179 (Ala. 1991). See also Parker v. Dugger, ___ U.S. ___, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991).
*1099 The trial judge rejected the mitigating circumstance of  13A-5-51(6) that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired":
"The Court further finds that although evidence was produced by defendant at the sentencing hearing before the jury by Dr. James Crowder, clinical psychologist, that Talwin would have impaired the defendant's judgment, the Court also had evidence before it regarding the defendant's actual actions during and after the murder of Mrs. Sennett which demonstrate that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired. The defendant's actions in placing cotton socks over his hands prior to the killing, his action in throwing away the murder weapon after the killing, his attempting to make it look like a burglary which had `gone bad,' his throwing away the stereo and burning of his clothes is all evidence that the defendant at the time in question appreciated that his conduct was criminal, and that he might be apprehended, and for that reason did what he could to avoid apprehension."
R. 2154-55. The rejection of this mitigating circumstance was proper and the findings of the trial judge are supported by the evidence. "[V]oluntary intoxication will not constitute grounds for the mitigating circumstance in this cause." Thompson v. State, 503 So.2d 871, 881 (Ala.Cr.App.1986), affirmed, 503 So.2d 887 (Ala.), cert. denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987), followed in Kuenzel v. State, 577 So.2d at 522.
The trial judge found the existence of two nonstatutory mitigating circumstances.
"[1] The Court does find that the jury's recommendation is a mitigating factor, and the Court has considered said mitigating factor at this sentence hearing. The jury was allowed to hear an emotional appeal from the defendant's mother. Although the defendant's mother attempted to blame the defendant's drug addiction on the medication the defendant had taken as a child for his condition diagnosed as `hyperactivity,' there was no proof that such was the case. Dr. James Crowder testified that a child taking ritalin as prescribed for treatment for hyperactivity would have no withdrawal symptoms from said drug when such drug was discontinued. The Court does not find that the defendant's problems during his childhood is a mitigating factor. He was appropriately treated for said condition according to the testimony of Dr. Crowder.
"Furthermore evidence was presented to the jury that the husband of the victim was the instigator of the killing of his wife, but the fact that the victim's husband conspired with the defendant to kill his wife does not make this defendant any less culpable, and is not a mitigating factor.
"[2] The court does find that the defendant's remorse is a mitigating factor."
R. 2155.
The trial judge then weighed the aggravating and mitigating circumstances:
"The Court having considered the aggravating circumstance as it was proven, that the murder was done for pecuniary gain and the following mitigating circumstances, namely: the defendant's age and his remorse and the Court having considered as a mitigating factor that the jury recommended a sentence of life without parole, the Court finds that the aggravating circumstance outweigh[s] the mitigating circumstances outlined above and the mitigating factor that the jury recommended a sentence of life without parole. The Court does find that there is a reasonable basis for enhancing the jury's recommendation of sentence for the reasons stated above, that the jury was allowed to consider the defendant's mother's emotional appeal regarding his childhood problems and her opinion regarding the cause of the defendant's illegal drug use and abuse. The Court also finds that the defendant at the time before, during and after the *1100 killing did appreciate the criminality of his conduct and in fact sought to avoid apprehension, and that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired.
"Therefore, on this the 21st day of June, 1989 with the defendant, John Forrest Parker, being present, and having been convicted by a jury of capital murder and the Court having weighed the aggravating circumstance against the mitigating circumstances and factors and the Court having found that the aggravating circumstance outweigh[s] the mitigating circumstances and factors,
"It is therefore, ORDERED, ADJUDGED AND DECREED BY THE COURT, and it is the judgment of this Court and its sentence of law that the defendant, John Forrest Parker, suffer death by electrocution."
R. 2155-2156.
Nowhere in the sentencing order did the trial judge "enter specific written findings concerning the existence or nonexistence of ... each mitigating circumstance enumerated in section 13A-5-51," as required by Ala.Code 1975,  13A-5-47(d) (emphasis added). For that reason, this Court declines, at this time, to address the appellant's argument that the trial court erred in not finding the existence of the statutory mitigating circumstance that the appellant "was an accomplice in the capital offense committed by another person and his participation was relatively minor,"  13A-5-51(4). Because the trial court found the nonexistence of one mitigating factor, this Court also declines, at this time, to address the appellant's argument that the trial judge erred in finding that the aggravating circumstance outweighed the mitigating circumstances.
In addition to the reasons set out in Part I of this opinion, this cause is also remanded with instructions that the trial judge 1) make new findings regarding the aggravating and mitigating circumstances, 2) weigh those aggravating and mitigating circumstances and determine whether the aggravating circumstances outweigh the mitigating circumstances, and 3) enter a proper sentencing order as required by Ala.Code 1975,  13A-5-47(d). The trial judge is granted the authority to resentence the appellant in the event she determines that death is not a proper sentence. A return shall be made to this court within 90 days from the date of this opinion.

XXV.
The trial judge did not violate the principles of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and did not minimize the jury's role and responsibility in sentencing by repeatedly using the term "recommended sentence" or "recommendation" in her oral charge to the jury at the sentence phase of the trial. Kuenzel, supra. See Martin v. State, 548 So.2d 488, 494 (Ala.Cr.App.1988), affirmed, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).

XXVI.
Because one of the appellant's two court-appointed attorneys had five years of prior criminal law experience, the appellant's claim that he is entitled to a new trial on the ground that the requirements of Ala.Code 1975,  13A-5-54, were not met is without merit. See Jacobs v. State, 371 So.2d 429, 447 (Ala.Cr.App.1977), reversed on other grounds, 371 So.2d 448 (Ala.1979). The trial judge entered written findings of facts and conclusions of law on this issue. Those findings are supported by the record.
Prior to trial, one of the appellant's two appointed counsel, H. Thomas Heflin, Jr., filed, in district court, a "motion for reconsideration of appointment" in which he alleged that "in his opinion he has not had five years prior experience in active practice of criminal law." R. 1938. The district judge ruled that this motion would "follow" the case to circuit court for "further consideration." R. 1948. That motion was denied on April 12, 1988. R. 1964. After conviction and sentence, defense counsel filed a second "motion for reconsideration of appointment," which was denied *1101 on October 26, 1989. Supplemental Transcript at 92. Defense counsel challenged the trial judge's ruling by filing a petition for writ of mandamus in the Court of Criminal Appeals. This Court remanded the cause to the trial judge for an evidentiary hearing and a determination of whether counsel was qualified under Ala.Code 1975,  13A-5-54. That section provides:
"Each person indicted for an offense punishable under the provisions of this article who is not able to afford legal counsel must be provided with court appointed counsel having no less than five years' prior experience in the active practice of criminal law."
On remand, an evidentiary hearing was held. The trial judge entered lengthy and detailed findings of facts and concluded that Heflin was qualified to represent the appellant.
We summarize portions of those findings as follows: Heflin was licensed to practice law in the State of Alabama on September 27, 1979. He clerked for a federal district court judge from August 1979 to August 1980. He practiced law with a law firm in London, England, from September 1980 until April 1981. Immediately after that he entered the general practice of law as an associate with a law firm of Rosser and Munsey in Tuscumbia, Alabama. He remained with that firm until December 1985. During that time he handled four felony cases (three appointed and one retained) involving burglary in the third degree, receiving stolen property in the second degree and theft of property in the first degree, theft in the second degree, and murder. Heflin tried the murder case by himself and preserved error. The conviction was appealed by other counsel and was reversed by the Alabama Supreme Court. See McCormack v. State, 431 So.2d 1336 (Ala.Cr.App.1982) (Bowen, J., dissenting), reversed, 431 So.2d 1340 (Ala.1983).
While an associate with Rosser and Munsey, Heflin also handled four misdemeanor cases involving harassment, possession of marijuana, and resisting arrest. Documents show that he also handled a misdemeanor charge of assault in the third degree and two felony charges of leaving the scene of an accident. He also handled at least five traffic cases involving speeding, driving on the wrong side of the road (a misdemeanor), and driving under the influence (a misdemeanor).
After leaving the Tuscumbia law firm, Heflin engaged in a civil litigation practice from January 1986 until October 1987 with the firm of Hare, Wynn, Newell, and Newton in Birmingham, Alabama. During that time, Heflin was not involved in any criminal litigation.
In October 1987, Heflin returned to Tuscumbia and became a partner in the law firm of Rosser and Munsey. He handled one DUI case before April 1988 when he was appointed to represent the appellant. Since that appointment, Heflin handled five criminal cases involving DUI and other misdemeanors.
The trial judge then made the following findings:
"The Court further finds from the evidence that the law firm of Rosser & Munsey, with whom Mr. Heflin was associated from 1981 through the year 1985 was involved in an active criminal litigation practice. Further, Mr. Heflin's present partners, Michael Ford and Stanley Munsey, both have represented criminal defendants in capital cases prior to attorney Heflin's appointment in the present case, and that Mr. Munsey actually assisted Mr. Heflin in the representation of the defendant in this case.
"Mr. Heflin also testified that he is an active trial lawyer, and has tried at least twenty-five to thirty cases before a jury. Although Mr. Heflin testified that he did not consider himself competent at the time of the appointment in April of 1988 he was aware of the requirements of the Code of Professional Responsibility (Canon 6, EC6-1) that the attorney should accept employment in matters which he is or intends to become competent to handle and should use all reasonable effort to acquire the necessary competency prior to the time of trial. The Court finds that Mr. Heflin felt the same way prior to accepting the appointment in the *1102 McCormack murder case which was tried in 1982, and that Mr. Heflin, again consistent with the Code of Professional Responsibility did become competent to try that case at the time of trial. The State's Exhibit No. 8 certainly reflects that Mr. Heflin was familiar with motions and pleading practice in criminal cases at the time he accepted the appointment in 1988, and Mr. Heflin's fee petition certainly is an indication that Mr. Heflin spent an appropriate amount of time on research and motion and pleading practice in the instant case and fulfilled his duty to his client.
"The Court further finds that the Honorable Gene M. Hamby, co-counsel for appellant in the instant case, was admitted to the practice of law in the State of Alabama, in 1968....
"The Court further finds that since his admission to the practice of law in the State of Alabama, Mr. Hamby has been engaged in litigation practice and has actually tried 100 cases or more.
"Mr. Hamby was involved in criminal litigation in 1969 when he was appointed to a felony case where the charge involved Receiving and Concealing Stolen Property. He has handled a felony drug charge for a regular client in 1971, and may have been involved in one or two other felony cases in the early 70's. Mr. Hamby testified that he has represented regular clients in misdemeanor and traffic cases from 1968 to 1988, but they have been limited to approximately 10-15 cases. Mr. Hamby testified that in his opinion he was not competent to represent the appellant, when he was appointed on April 5, 1988. His opinion is based on his definition of competency which involved three basic criteria: namely (1) general trial ability on the part of the attorney; (2) familiarity with recent case law in the field of criminal law; and (3) familiarity with procedural law in the field of criminal law. Mr. Hamby testified that he felt qualified with respect to the first criteria but felt that the fact that he had not actively kept up with criminal cases and procedural law rendered him incompetent with respect to the two additional criteria.
"Mr. Hamby testified that he was familiar with Code of Professional Responsibility and the requirement that he equip himself and becomes competent to handle a case prior to trying it.
"The Court further finds that since the appointment in the instant case Mr. Hamby has accepted another appointment in a criminal case.
"Mr. Hamby testified that he has been engaged in civil practice of almost any kind. He has never handled a capital case other than the instant. Mr. Hamby also testified that with respect to other criminal cases he has handled during his twenty years of practice he has had to qualify and prepare himself both with respect to issues of substantive criminal law and issues of procedural criminal law.
"The Court further finds that while Mr. Hamby was associated with the law firm of Heflin & Rosser in Colbert County, Alabama, he was involved in doing legal research for his partners in criminal cases; he was involved in brief preparation and appellate work. Mr. Hamby testified that the then attorney Heflin, who later became Chief Justice of the Alabama Supreme Court and later United States Senator and attorney Rosser, were individuals knowledgeable in the field of criminal law, that they had an active criminal practice, and that they could and did guide him when he was associated with them.
"Mr. Hamby also testified that during a period of time much greater than five years he has handled criminal matters.
"The Court further finds from the testimony of Mr. Hamby that there were no attorneys in Colbert County, Alabama, who are considered "Criminal Law Specialist[s]" at the time of Mr. Hamby's and Mr. Heflin's appointment to represent the appellant, nor are there any at the present time.
"Mr. Hamby also testified that he would undertake to represent a defendant in a criminal case if he could either *1103 settle it or else associate a lawyer with more criminal law experience than he.
"Doug Evans, Assistant District Attorney in Lauderdale County, Alabama, testified that based on his professional interaction with Mr. Heflin, Mr. Heflin had demonstrated knowledge and confidence in the field of criminal law.
"Mrs. Carrie King, Deputy Clerk for the Circuit Court, Criminal Division, Colbert County, Alabama, testified that she is familiar with Mr. Heflin and that he regularly has filed pleadings and other documents in criminal cases.
"....
"CONCLUSION[S] OF LAW
"Section 13A-5-54 of the Code of Alabama, 1975 as amended provides that a defendant in a capital case who is not able to afford legal counsel must be provided with 1 Court appointed counsel having no less than five years' prior experience in the active practice of criminal law. The defendant in the instant case was provided with two attorneys to represent him in the instant case. Using the criteria set forth in Jacobs v. State, 371 So.2d 429, (1978) as interpreting Section 13A-5-54, the Court concludes that Mr. H. Thomas Heflin, Jr. had no less than five years' prior experience in the active practice of criminal law pursuant to said code provision when he was appointed to represent the appellant, John Forrest Parker. The evidence shows that said attorney has been involved in a variety of criminal litigation, has tried a murder case to completion in which he was the sole attorney for the defendant, prior to being appointed in the instant case, and has exhibited that he is thoroughly familiar with pleading practice, procedure and case law in criminal cases at the time he accepted the appointment in the instant case. The Court concludes that Mr. Heflin is qualified under Section 13A-5-54.
"In addition to being afforded legal counsel who is qualified under Section 13A-5-54, the defendant was provided with an additional counsel, who had practiced law in Colbert County, Alabama, for twenty years. Although the Court concludes from the criteria set out in Jacobs v. State, supra that Mr. Hamby had not been involved in the practice of criminal law as provided by Section 13A-5-54, the evidence revealed that he was an experienced trial lawyer. Mr. Hamby himself testified that he felt competent to undertake representation in criminal cases of defendants if he either could settle the matter, or associate another attorney with a broader experience in criminal law. In the instant case Mr. Hamby, a competent trial lawyer, was associated with an attorney who was more experienced in the active practice of criminal law, namely, Mr. Heflin, and thus Mr. Hamby was competent pursuant to his own testimony.
"It is the conclusion of this Court that the appellant, John Forrest Parker, was provided with one attorney, Mr. Heflin, who is qualified under Section 13A-5-54. Additionally, to further insure that the defendant was furnished competent representation in this matter, the court appointed an able trial lawyer to assist Mr. Heflin in the defense of the defendant. Thus the Court concludes that the requirements pursuant to the Code of Alabama, Section 13A-5-54 are met."
Supplemental Record at 97-103 (emphasis in original).
We find that the appellant had the counsel to which he was entitled under Ala.Code 1975,  13A-5-54.
This cause is remanded for the reasons set forth in Parts I and XXIV of this opinion.
REMANDED WITH DIRECTIONS.
All Judges concur.
NOTES
[*] Reporter of Decision's Note: The June 14, 1991, opinion in Bird was withdrawn and a new decision issued on December 6, 1991.
[1] The panel decision in this case was subsequently vacated, Johnson v. Dugger, 920 F.2d 721 (11th Cir.1990), and reheard en banc, Johnson v. Singletary, 938 F.2d 1166 (11th Cir.1991). It appears that the panel decision on this point was not disturbed by the opinion en banc. 938 F.2d at 1186.
[2] See n. 1, supra.